# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MYRNA GAUD-FIGUEROA, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:09-CV-1530 (JCH) |
| V. | : | |
| | : | |
| METROPOLITAN LIFE INSURANCE | : | |
| COMPANY, | : | FEBRUARY 14, 2011 |
| Defendant. | : | |

**RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [Doc. No. 19] and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. No. 18]**

## I. INTRODUCTION

Plaintiff Myrna Gaud-Figueroa has brought this action pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, alleging that defendant Metropolitan Life Insurance Company ("MetLife") wrongfully terminated her long-term disability benefits. On July 15, 2010, MetLife filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. No. 18), and Gaud-Figueroa filed a Motion for Judgment on the Administrative Record (Doc. No. 19).

Because MetLife's benefit determination was not arbitrary and capricious, except with regard to its conclusion that Gaud-Figueroa was not covered by the Plan in September and October 2008, MetLife's Motion for Summary Judgment is granted in part and denied in part. Gaud-Figueroa's Motion for Judgment on the Administrative Record is granted in part and denied in part.

## II.    STANDARD OF REVIEW

### A.    Treatment of a Motion for Judgment on the Administrative Record

Gaud-Figueroa has filed a Motion for Judgment on the Administrative Record, a type of motion that is not authorized by the Federal Rules of Civil Procedure.  The court may treat a motion for judgment on the administrative record as a motion for summary judgment, provided the court has not already ruled on an earlier motion for summary judgment by that party.  Muller v. First Unum Life Insurance Co., 341 F.3d 119, 124 (2d Cir. 2003); see also Daniel v. Unumprovident Corp., 261 Fed. Appx. 316, 317 (2d Cir. 2008) (upholding district court's treatment of parties' motions for judgment on the administrative record as cross-motions for summary judgment); Troy v. Unum Life Ins. Co. Of America, No. 03 Civ. 9975(CSH), 2006 WL 846355, at *8 (S.D.N.Y. Mar. 31, 2006) (treating parties' motions for judgment on the administrative record as cross-motions for summary judgment).  In this case, Gaud-Figueroa has not previously filed a motion for summary judgment, and Gaud-Figueroa concedes that its Motion presents the same issues as a motion for summary judgment.  Pl.'s Objection to Def.'s Mot. for Summ. J., at 1.  Accordingly, the court treats Gaud-Figueroa's Motion for Judgment on the Administrative Record as a Cross Motion for Summary Judgment.

### B.    Standard of Review in Motion for Summary Judgment

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a

motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' "  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  In this case, neither Gaud-Figueroa nor MetLife dispute any fact material to the disposition of this matter.

## III.    BACKGROUND

The following facts are undisputed.[1]  Gaud-Figueroa started as a Home Depot

employee in 2000.  Def.'s D. Conn. L. Civ. R. 56(a)(1) Statement of Material Facts

("Def.'s 56.1"), ¶ 1, AR 0803.[2]  As an eligible Home Depot employee, Gaud-Figueroa

was covered by a short and long-term disability plan (the "Plan"), which was both

insured and administered by MetLife.[3]  Def.'s 56.1, ¶¶ 2-3, AR 0006.

### A.    Details of the Plan

To be "Disabled" under the Plan "means that, due to an Injury or Sickness, you

require the regular care and attendance of a Doctor and . . . you are unable to perform

each of the material duties of your regular job or any gainful occupation for which you

---

[1] The facts contained herein are taken from the Administrative Record and from MetLife's Local Rule 56(a)(1) Statement.  (See Doc. Nos. 18-2 through 18-47).  Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party.  Each statement of material fact or denial must include a citation to an affidavit or other admissible evidence.  In addition, the opposing party must submit a list of disputed factual issues.  See D. Conn. L. Civ. R. 56(a)(2) & 56(a)(3).
Gaud-Figueroa has failed to file a Local Rule 56(a)(2) Statement in opposition to MetLife's Motion for Summary Judgment.  Accordingly, MetLife's facts are deemed admitted, to the extent they are supported by the record.  See D. Conn. L. Civ. R. 56(a)(1) ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.").

[2] MetLife has submitted the complete Administrative Record as a series of exhibits to its Motion for Summary Judgment.  Gaud-Figueroa also submitted limited segments of the Administrative Record with her Motion for Judgment on the Administrative Record.  Because the documents appear to be the same, and MetLife's reproduction of the Administrative Record is comprehensive, all citations will be to MetLife's complete version of the administrative record and will be denoted: AR [page number].  All pages have a preceding Bates stamp of "GAUDFIGUEROA00."

[3] Neither party disputes the fact that the policy in question is an employee welfare benefit plan within the meaning of 29 U.S.C. §§ 1002(3) and 1002(2)(A) and is governed by ERISA. See Compl., at ¶ 8; Answer, at ¶ 8.

are reasonably qualified taking into account your education, training, and experience."

AR 0027.  The Summary Plan Description (SPD) prepared by Home Depot also defined

"Disability" to mean that "due to an injury or sickness," the participant "require[s] the

regular care of a qualified doctor," and the participant is "unable to perform each of the

material duties of [his] regular job or any gainful occupation for which [he is] reasonably

qualified, taking into account [his] education, training and experience."  Def.'s 56.1, ¶ 4;

AR 0070.

The SPD informed the participant that "MetLife must receive certification with

accompanying medical documentation of a disability from your attending doctor before

benefits are considered for payment."  Def.'s 56.1, ¶ 5; AR 0070.  Under the Plan,

benefits may only be issued if "proof of continued Disability is submitted, at your

expense, to [MetLife] upon request."  AR 0029.  "Proof" of a valid claim under the short

and long-term disability plans "must describe the event, the nature and the extent of the

cause for which a claim is made; it must be satisfactory to [MetLife]."  AR 0034.

In both the SPD and the Plan itself, MetLife claimed full discretionary authority to

interpret and apply the Plan.  Def.'s 56.1, ¶ 7, AR 0045 ("In carrying out their respective

responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall

have discretionary authority to interpret the terms of the Plan and to determine eligibility

for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any

interpretation or determination made pursuant to such discretionary authority shall be

given full force and effect, unless it can be shown that the interpretation or

determination was arbitrary or capricious."); AR 0407 ("The Plan Administrator . . . has

the full power and authority in its absolute discretion to determine all questions of eligibility for and entitlement to benefits, and to interpret and construe the terms of the plans.").

The Plan featured a 24-month limit on payments for "disabilities due to mental/nervous disorders."  Def.'s 56.1, ¶ 6, AR 0069; 0032.  The 24-month period includes an initial 6 month waiting period and 18 months of benefits.  Id.

Gaud-Figueroa was eligible to receive 60% of her monthly salary in benefits under the long-term disability plan, or $2,054 per month.  Def.'s 56.1, ¶ 79, AR 0612.

B.    Timeline of Events

MetLife initially approved Gaud-Figueroa for Short-Term Disability (STD) benefits for spinal strain and severe back pain for the period from May 19, 2007 through June 11, 2007.  Def.'s 56.1, ¶¶ 8, 30.  Gaud-Figueroa returned to work part-time on June 11, 2007, and MetLife extended her STD benefits through September 23, 2007.  Def.'s 56.1, ¶¶ 33, 39.

On August 24, 2007, Gaud-Figueroa submitted a new claim for STD benefits, based on foot spurs, melanoma, and pinched nerves in her left foot.  Def.'s 56.1, ¶ 40. Gaud-Figueroa stopped working part-time at Home Depot on September 6, 2007. Def.'s 56.1, ¶ 42.  Gaud-Figueroa's new claim was denied on September 10, 2007. Def.'s 56.1, ¶ 43.  However, Gaud-Figueroa's podiatrist performed left foot surgery on Gaud-Figueroa on September 7, 2007 and right foot surgery on November 9, 2007. Def.'s 56.1, ¶ 46, 49.  MetLife subsequently extended Gaud-Figueroa's STD benefits to the maximum benefit date of November 2, 2007.  Def.'s 56.1, ¶ 52.

On December 5, 2007, Gaud-Figueroa applied for Long-Term Disability (LTD) benefits for extreme lower back pain.  Def.'s 56.1, ¶ 53.  Gaud-Figueroa submitted attending physician statements from her neurologist, Dr. Patrick Mastroianni, and her podiatrist, Dr. David Sharnoff; her psychiatrist, Dr. Sudha Sreenivasan, faxed a letter to MetLife.  Def.'s 56.1, ¶¶ 58-66.  Gaud-Figueroa's psychiatrist advised MetLife that Gaud-Figueroa suffered from post-traumatic stress disorder ("PTSD") and a major depressive disorder, recurrent.  Def.'s 56.1, ¶ 67.  However, Dr. Sreenivasan did not submit any test results, clinical office notes, or other treatment notes to MetLife.  Def.'s 56.1, ¶ 74.

On January 31, 2008, a nurse consultant for MetLife recommended that Gaud-Figueroa be approved for LTD benefits for her claims of PTSD and depression, but not for her claim of back pain, because there was insufficient medical information in the file to support a diagnosis of neuropathy or radiculopathy.  Def.'s 56.1, ¶¶ 75-77, AR 0813-0817.

By letter dated February 12, 2008, MetLife approved Gaud-Figueroa for LTD benefits effective as of November 3, 2007.  Def.'s 56.1, ¶ 78.  At that time, MetLife requested that Gaud-Figueroa provide MetLife with office visit notes and treatment notes, with physical examination findings and recent attending physician statements.  Def.'s 56.1, ¶ 80, AR 0613.  When MetLife did not receive that information, it reiterated its request by letter on March 7, 2008; by phone on March 17, 2008; and again by letter on March 27, 2008, warning Gaud-Figueroa that a failure to submit the required information would result in the termination of her benefits.  Def.'s 56.1, ¶¶ 81-85, AR

0599-0600; 0844; 0597.  On April 8, 2008, MetLife discontinued Gaud-Figueroa's LTD benefits due to her ongoing failure to submit the requested medical information.  Def.'s 56.1, ¶ 86.

After her benefits were terminated, Gaud-Figueroa submitted additional material from her treating physicians.  On May 19, 2008, Gaud-Figueroa's neurologist opined that Gaud-Figueroa was capable of returning to sedentary work.  Def.'s 56.1, ¶ 97, AR 0587.  However, on June 6, 2008, Dr. Mastroianni informed MetLife that he believed that Gaud-Figueroa was not capable of returning to work at Home Depot, because "her job as an interior designer at Home Depot is not consistent with sedentary work restriction."  Def.'s 56.1, ¶¶ 103-105, 107, AR 0572, AR 0570.  Dr. Mastroianni stated that, "[u]nless truly sedentary work on a part-time basis can be found for her, Mrs. Gaud-Figueroa would be considered totally incapable of work."  Def.'s 56.1, ¶ 105, AR 0572.  In May 2008 and July 2008, Dr. Mastroianni submitted additional medical records to MetLife and completed a restriction and limitation form for MetLife.  Def.'s 56.1, ¶¶ 99-101, 107-08.

On July 28, 2008, the store manager at Gaud-Figueroa's Home Depot branch agreed to offer accommodations to convert Gaud-Figueroa's "light" duty job into a part-time position.  Def.'s 56.1, ¶ 111, AR 0871.  On August 8, 2008, Dr. Mastroianni informed MetLife that he did not believe Gaud-Figueroa would be able to work any hours at Home Depot, even with the proposed accommodations. Def.'s 56.1, ¶¶ 115-116, AR 0562.

On August 26, 2008, MetLife assigned an independent physician to review Gaud-Figueroa's file and consult with Gaud-Figueroa's treating physicians.  Def.'s 56.1, ¶¶ 117-18.  Dr. Sergio Loaiza, M.D., board certified in neurology, concluded that "there is no objective documentation to support the claimant's inability to work."  Def.'s 56.1, ¶ 126, AR 0535.  On, October 24, 2008, MetLife advised Gaud-Figueroa that it had determined that she was able to perform sedentary to light level work and was thus not Disabled as required by the Plan.  Def.'s 56.1, ¶ 144, AR 0527-0528.  MetLife noted that Gaud-Figueroa had not submitted any "abnormal physical exam findings, abnormal neurological exam findings, abnormal diagnostics, abnormal labs, or restrictions and limitations . . . ."  Def.'s 56.1, ¶ 146, AR 0527.

On September 29, 2008, Gaud-Figueroa was admitted to Griffin Hospital for psychiatric reasons.  AR 0518.  Gaud-Figueroa was subsequently released into an intensive outpatient program on October 6, 2008.  Def.'s 56.1, ¶¶ 150-151, AR 0518; 0520.  At Griffin Hospital, Gaud-Figueroa was diagnosed with major depression, severe recurrent, without psychosis.  Def.'s 56.1, ¶ 155, AR 0520.  On November 7, 2008, MetLife received medical records from Griffin Hospital regarding this episode.  Def.'s 56.1, ¶ 149, AR 0517-0526.

On April 13, 2009, Gaud-Figueroa, through counsel, appealed MetLife's termination of her LTD benefits.  Def.'s 56.1, ¶ 161, AR 0509-0510.  At that time, Gaud-Figueroa submitted additional medical information from her podiatrist, her psychiatrist, and a doctor from the physical medicine department at Griffin Hospital.  Def.'s 56.1, ¶¶ 164-165, AR 0509-0510.  MetLife referred Gaud-Figueroa's case to two independent

physicians: (1) Dr. Peter Sugerman, M.D., board certified in adult psychiatry, and (2) Dr. Kevin Smith, D.O., board certified in preventive medicine and occupational medicine. Def.'s 56.1, ¶¶ 182, 191, AR 0905-0906. Both independent physicians offered opinions in their areas of expertise and concluded that the records submitted did not support a finding of disability after April 8, 2008, the date MetLife first terminated Gaud-Figueroa's LTD benefits. Def.'s 56.1, ¶¶ 187, 197-198, 200; AR 0452; 0441-0442; 0448. However, Dr. Sugerman did opine that Gaud-Figueroa "suffered severe psychiatric impairments starting in September 2008 through October 2008." AR 0452.

MetLife also commissioned an "Employability Assessment" from the Corvel Corporation that concluded that Gaud-Figueroa was vocationally qualified to perform the duties of several sedentary occupations, including telephone solicitor, information clerk, and customer service representative. Def.'s 56.1, ¶¶ 207; 213, AR 0454-0456; 0466-0473.

MetLife denied Gaud-Figueroa's administrative appeal on June 19, 2009, Def.'s 56.1, ¶ 214, AR 0431-0436, and Gaud-Figueroa filed this action on September 28, 2009 (Doc. No. 1).

## IV. DISCUSSION

### A. Standard of Review for Denial of ERISA Benefit Claim

A challenge to the denial of benefits under section 502(a)(1)(B) is reviewed under a de novo standard, unless the plan vests the administrator with "the discretionary authority to determine eligibility." Hobson v. Metropolitan Life Insurance Co., 574 F.3d 75, 82 (2d Cir. 2009); Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989).  If an employee benefits plan confers the plan administrator with discretion to determine eligibility for benefits or to interpret the plan's terms, then the administrator's decision will not be disturbed unless it is "arbitrary and capricious."  Hobson, 574 F.3d at 82.  In this case, the Plan and the SPD both assign discretionary authority to MetLife to interpret and apply the Plan, AR 0045, 0407, so the court applies the arbitrary and capricious standard of review.  Under the arbitrary and capricious standard of review, the court:

> [M]ay overturn a decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.  This scope of review is narrow; thus, we are not free to substitute our own judgment for that of the insurer as if we were considering the issue of eligibility anew.

Hobson, 574 F.3d at 83-84 (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (internal quotation marks and alterations omitted).  Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance."  Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks and alterations omitted).

Where, as here, the plan administrator both evaluates and pays benefits claims, a structural conflict of interest exists.  See Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 111-12 (2008).  Courts must "take into account" and "weigh" this conflict of interest in determining whether the administrator has abused its discretion, but the administrator's decisions are still reviewed under the deferential arbitrary and capricious standard.  See Hobson, 574 F.3d at 82-83 (citing McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008).  The court concludes that MetLife operated under a

conflict of interest. Weighing this conflict as a factor, the court still concludes that MetLife's decisions were neither arbitrary nor capricious, with the exception of their decision for the September-October 2008 time frame.

B. Gaud-Figueroa's Challenges to MetLife's Determination

In this case, Gaud-Figueroa agrees with MetLife that the Plan grants MetLife discretionary authority to interpret the terms of the Plan and that MetLife's decision to terminate Gaud-Figueroa's LTD benefits must be reviewed under the arbitrary and capricious standard. See Pl.'s Objection to Def.'s Mot. for Summ. J., at 1. Gaud-Figueroa argues that MetLife's termination of her benefits was nevertheless arbitrary and capricious because: (1) MetLife reached its decision by adding a requirement of objective proof not found in the Plan, and (2) MetLife ignored the opinions of Gaud-Figueroa's treating physicians. Neither argument prevails. MetLife was entitled to require that Gaud-Figueroa submit satisfactory proof of her claimed disabilities. Moreover, MetLife acknowledged the opinions of Gaud-Figueroa's treating physicians but was not required to credit those opinions over the conclusions reached by the three independent physician consultants it hired to review Gaud-Figueroa's medical condition.

1. Whether MetLife Erred in Requiring Objective Proof of Disability

Gaud-Figueroa contends that MetLife impermissibly "based its decision on terms that were not in the Home Depot U.S.A., Inc. plan." Pl.'s Mot. for J. on the Admin. Record, at 12. Specifically, Gaud-Figueroa argues that MetLife added a requirement of "objective proof" to the Plan by terminating Gaud-Figueroa's LTD benefits in an initial termination letter stating that "there are no abnormal physical exam findings, abnormal

diagnostics, abnormal labs, or restrictions and limitations that are supported by exam findings." <u>See</u> Pl.'s Objection to Def.'s Mot. for Summ. J., at 1-2.

MetLife is entitled to require Plan participants to produce objective medical evidence of total disability. <u>See</u> <u>Hobson</u>, 574 F.3d at 88. "[I]t is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability." <u>Id.</u>; <u>see</u> <u>also</u> <u>Tortora v. SBC Communications, Inc.</u>, __ F. Supp. 2d __, 2010 WL 3154566, at *9 (S.D.N.Y. 2010) (following <u>Hobson</u>, administrator "not required to accept . . . subjective complaints in the absence of objective evidence supporting disability").

Gaud-Figueroa relies on the cases <u>Durr v. Metropolitan Life Insurance Co.</u>, 15 F. Supp. 2d 205 (D. Conn. 1998), and <u>Miles v. NY State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan</u>, 698 F.2d 593 (2d Cir. 1983), for the proposition that administrators may not unilaterally add requirements to an insurance plan, including a requirement of objective evidence. To be sure, an administrator cannot concoct new requirements after a claim has been filed. Nevertheless, <u>Hobson</u> makes clear that an administrator may require objective medical support even when the requirement "is not expressly set out in the plan." <u>Hobson</u>, 574 F.3d at 88.

Under the Plan, participants must submit written proof of their claims. AR 0034. "Proof" of a valid claim under the short- and long-term disability plans "must describe the event, the nature and the extent of the cause for which a claim is made; it must be

satisfactory to [MetLife]." Id.  Similarly, the SPD states that, "MetLife must receive certification with accompanying medical documentation of a disability from your attending doctor before benefits are considered for payment."  Def.'s 56.1, ¶ 5; AR 0070.  Given the language in the Plan and the SPD, it was not unreasonable for MetLife to interpret the insurance contract as requiring Plan participants to provide objective documentation of their disability.  "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control."  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008) (citation omitted).  Here, MetLife interprets the Plan to require objective evidence of total disability.  It cannot be said that this interpretation of the Plan is irrational, and therefore MetLife's interpretation controls.

Courts in the Second Circuit have recognized that the chief symptoms of certain illnesses – such as chronic fatigue syndrome (CFS), fibromyalgia, and Bechet's disease – are subjective, and in these cases the reports of treating physicians regarding subjective symptoms deserve special weight.  See Diamond v. Reliance Standard Life Ins., 672 F. Supp. 2d 530, 537 (S.D.N.Y. 2009) ("especially when the chief symptoms of the illnesses are subjective . . . due weight should be given to the treating physician's findings since that physician has the most experience with the patient and his or her history with the symptoms of the illness."); Strope v. Unum Provident Corp., 2010 WL 1257917, at *7 (W.D.N.Y. 2010) (same).  Moreover, for illnesses for which an administrator concedes that objective proof cannot be produced, a court may reject an administrator's irrational insistence on objective evidence.  See Magee v. Metropolitan

Life Ins. Co., 632 F. Supp. 2d 308, 318, 321 (S.D.N.Y. 2009) (ignoring "MetLife's erroneous objective evidence requirement" where "in a Catch-22, MetLife acknowledges that there is no test for CFS" but MetLife nevertheless rejected plaintiff's claim because he "failed to provide 'objective evidence' establishing that he was suffering from a disabling impairment").

However, even in a claim involving an illness characterized principally by subjective symptoms, such as fibromyalgia, the Second Circuit has stated that it is not unreasonable for a plan administrator to require objective evidence of disability as long as the claimant is notified.  Hobson, 574 F.3d at 88 (citing Johnson v. Metro Life Ins. Co., 437 F.3d 809, 813-14 (8th Cir. 2006)).  In this case, Gaud-Figueroa has not presented any evidence that the three ailments for which she has claimed disability – (1) pain in her back; (2) pain from plantar fasciitis and heel spurs in her feet; and (3) symptoms resulting from her depression or PTSD – cannot be documented through objective medical findings.  Indeed, the administrative record actually includes objective evidence that Gaud-Figueroa's back and foot conditions, while painful, were not totally disabling.

        a.      MetLife's Conclusion That Gaud-Figueroa's Back Condition Was Not Disabling

With regard to Gaud-Figueroa's back pain, her own neurologist, Dr. Mastroianni, observed that the April 2007 MRI of her spine showed that "no nerve root [was] compromised" and only "[v]ery modest changes were observed at the L5-S1 level" of the spine.  AR 0726-27.  Dr. Mastroianni characterized the MRI results to be "very reassuring."  AR 0727.  Dr. Mastroianni also ordered and reviewed a May 7, 2007 X-ray

of Gaud-Figueroa's spine, which X-ray revealed "degenerative changes of the lumbosacral spine," but "no evidence to suggest instability." AR 0725. On the basis of the MRI and his direct assessment of the patient, Dr. Mastroianni opined on May 22, 2008, that Gaud-Figueroa could perform sedentary work. AR 0587.[4]

In connection with its first review of Gaud-Figueroa's benefits termination, MetLife hired Dr. Sergio Loaiza, M.D., board certified in neurology, as an independent consultant. Dr. Loaiza reviewed Gaud-Figueroa's file and spoke with her treating neurologist, Dr. Mastroianni. Dr. Loaiza concluded that there was "no objective documentation to support the claimant's inability to work." AR 0535. For its second review of Gaud-Figueroa's benefits termination, this time on administrative appeal, MetLife hired Dr. Kevin Smith, D.O., board certified in preventative medicine and occupational medicine, as an independent consultant. Dr. Smith reviewed Gaud-Figueroa's medical records and issued a report which concluded that Gaud-Figueroa's "subjective complaints outweigh clinical findings on examination and testing." AR 0442. Dr. Smith also concluded that Gaud-Figueroa's exams "have shown intact neurologic functioning and no evidence of lumbar radiculopathy." Id. Smith found "no evidence of instability on lumbar spine flexion and extension x-rays." Id.

---

[4] Although Dr. Mastroianni also opined on June 6, 2008, that Gaud-Figueroa was "not in any condition to work any hours at the Home Depot," this conclusion was based on Dr. Mastroianni's perception that Gaud-Figueroa's position with Home Depot was not sedentary. AR 0562, 0572. Because Gaud-Figueroa must be disabled from all forms of gainful employment for which she is qualified in order to be fully disabled under the Plan, AR 0027, her ability to return to her particular position at Home Depot did not bear on MetLife's eligibility determination. MetLife commissioned an independent employability assessment of Gaud-Figueroa that concluded that her education and experience qualified her for a number of sedentary occupations. AR 0454-0456.

Although it is possible that Gaud-Figueroa's spine deteriorated in the twelve months between the April 2007 MRI and her benefit termination, Gaud-Figueroa never submitted additional testing to MetLife to substantiate that claim. Dr. Krystyna Piotrowska, M.D., of the Physical Medicine Department at Griffin Hospital examined Gaud-Figueroa on September 18, 2008, and recommended that "at some point MRI of lumbosacral spine should be done to compare it with a year ago findings." AR 0513. No such tests were ever completed.

Based on the foregoing, the court cannot conclude that MetLife's determinations with regard to Gaud-Figueroa's back claims were arbitrary and capricious. MetLife permissibly credited the substantial evidence provided by two independent physicians who had reviewed Gaud-Figueroa's submissions and had spoken with her treating physicians. Both independent consultants were board-certified in relevant specialties. Cf. Demirovic v. Building Service 32 B-J Pension Fund, 467 F.3d 208, 212 (2d Cir. 2006) (finding that pension fund was entitled to credit opinions of two independent physicians, even where five treating physicians reached contrary conclusions, but still holding that pension fund's decision was arbitrary and capricious because claimant lacked education, experience, and language skills necessary to perform duties of a sedentary occupation).

            b.      MetLife's Conclusion That Gaud-Figueroa's Foot Condition
                    Was Not Disabling

With regard to Gaud-Figueroa's foot problems, the second independent consultant, Dr. Smith, spoke with Gaud-Figueroa's podiatrist, Dr. Sharnoff. In Dr. Sharnoff's Report dated August 28, 2008, Dr. Sharnoff had opined that Gaud-Figueroa

was disabled and unable to work, although this conclusion was based in part on his understanding that Gaud-Figueroa was experiencing "significant low back issues." AR 0511-0512. When speaking with Dr. Smith in May 2009, Dr. Sharnoff advised that Gaud-Figueroa "was doing reasonably well from a podiatric perspective," and although she still had lower back problems, he believed she was capable of "sedentary desk work with minimal walking." AR 0449. Dr. Smith's Report was sent to each of Gaud-Figueroa's testing physicians for review and comment, none of whom responded to MetLife. In his consultant report, Dr. Smith observed that "[t]here are inconsistencies in the medical information provided. There are no podiatric office notes, surgical reports, and foot x-rays since November 2007." AR 0448. Gaud-Figueroa had left and right foot surgeries in the fall of 2007, and there is no indication in the Administrative Record that pain related to her feet persisted after the successful foot surgeries. The court cannot conclude that MetLife's determination that Gaud-Figueroa's foot condition was not disabling was arbitrary and capricious.

        c.     MetLife's Conclusion That Gaud-Figueroa's Diagnoses of PTSD and Depression Were Not Disabling as of April 8, 2008

MetLife's determinations for Gaud-Figueroa's claims of PTSD and major depressive disorder present a more complicated question. Gaud-Figueroa's psychiatrist, Dr. Sudha Sreenivasan, provided statements to MetLife on four occasions: (1) a faxed letter dated December 5, 2007; (2) a completed MetLife questionnaire dated January 18, 2008; (3) an updated Attending Physician Statement dated September 15, 2008; and (4) a telephone conference with an independent physician consultant hired

by MetLife on May 5, 2009. AR 0451, 0543-0546, 0615-0616, 0618-0619. Dr. Sreenivasan diagnosed Gaud-Figueroa with PTSD and a recurring major depressive disorder, and Dr. Sreenivasan opined on several occasions that Gaud-Figueroa was unable to work. AR 0616; 0619; 0545. However, Dr. Sreenivasan never submitted office notes or treatment records despite repeated requests from MetLife. Def.'s 56.1, ¶ 74. Although Dr. Sreenivasan told MetLife's physician consultant that Gaud-Figueroa had trouble focusing and had memory problems, Dr. Sreenivasan did not provide any test results that would substantiate Gaud-Figueroa's subjective complaints of cognitive problems. Def's 56.1, ¶¶ 185-186.

As stated earlier, the Plan required Gaud-Figueroa to provide proof of a valid claim, "satisfactory to Metropolitan." Gaud-Figueroa was advised on at least four occasions that MetLife required office notes and treatment records to evaluate her claim. Def.'s 56.1, ¶¶ 80-85, AR 0597; 0599-0600; 0613; 0844. Gaud-Figueroa never produced the requested office notes from her treating psychiatrist. In a case involving a comparable Plan provision, the Second Circuit Court of Appeals determined that "it was appellant's burden under the Plan, not MetLife's, to submit, at his own expense, 'proof of disability, satisfactory to Metropolitan.'" Wojciechowski v. Metropolitan Life Insurance Co., 1 Fed. Appx. 77, 81, 2001 WL 38264 (2d Cir. 2001).

Two independent physician consultants hired by MetLife reviewed Gaud-Figueroa's medical records for evidence of disabling mental conditions. Dr. Sergio Loiaza, M.D., board certified in neurology, prepared his Report on September 5, 2008, and concluded that "[t]here is no clear documentation as to how the claimant's mood

disorder affects her activities of daily living, treatment plan or goals" and therefore "there is no objective documentation to support the claimant's inability to work . . . ." AR 0535. During Gaud-Figueroa's administrative appeal, MetLife hired Dr. Peter Sugerman, board certified in adult psychiatry, to review Gaud-Figueroa's medical records and produce an independent physician report regarding her psychiatric condition. Def.'s 56.1 ¶ 182, AR 0905. Dr. Sugerman produced that report on May 5, 2009. Dr. Sugerman concluded that between April 9, 2008 (the day after Gaud-Figueroa's Long-Term Disability benefits were terminated) and September 2008 (the month Gaud-Figueroa was admitted to Griffin Hospital for psychiatric reasons), "there is no psychiatric information provided that would support limitations and restrictions due to a mental health impairment." AR 0452. Dr. Sugerman added, "Dr. Sreenivasan did not provide any written notes in the file and did not have the file to report on this interval in our teleconference." Id.

Based on the foregoing, the court cannot conclude that MetLife's determinations with regard to Gaud-Figueroa's PTSD and depression claims were arbitrary and capricious for the period of time from April 9, 2008 to September 2008.

> d.    MetLife's Conclusion that Gaud-Figueroa's Diagnoses of PTSD and Depression Were Not Disabling in September and October 2008

The complicating factor is that the Administrative Record contains ample evidence that Gaud-Figueroa was Disabled in September and October 2008, four months after her Long-Term Disability benefits were terminated. On November 7, 2008, MetLife received psychiatric records from Griffin Hospital indicating that Gaud-Figueroa

had been hospitalized in September 2008.  In his Report, Dr. Sugerman observes that

the "claimant had become severely depressed and suicidal in September 2008," that

"[s]he ended up hospitalized," and that her treating psychiatrist reported that she suffers

"symptoms of PTSD, such as nightmares." AR 0451. The notes from Griffin Hospital

"indicate on 10/6/08 that there are deficits in attention and concentration and there are

ongoing depressive symptoms. GAF [Global Assessment of Functioning] is 45.

Although this is not clear-cut in supporting a severe psychiatric impairment, the

proximity to the hospitalization would justify a belief in severe impairment at that time."

AR 0452.  The independent physician Report from Dr. Smith observes that October

2008 psychiatry notes in Gaud-Figueroa's file indicate that she was suffering "auditory

hallucinations."  AR 0447.  Based on the psychiatric records from September and

October 2008, Dr. Sugerman opined:

> Overall, it is clear that the claimant suffered severe psychiatric impairments
> starting in September 2008 through October 2008. Beyond this time, the verbal
> report provided by Dr. Sreenivasan is convincing that ongoing impairments due
> to the depression have continued but are lacking in sufficient detail of specific
> ongoing symptoms, mental status findings, and associated global impairment
> over the course of eight months to be certain of this. I would like to see more
> documentation over this period of time before endorsing impairment beyond
> October, 2008.

AR 0452.  Thus, MetLife's own independent consultant and the documentary evidence

in the Administrative Record both point to the conclusion that Gaud-Figueroa was

Disabled in September and October 2008.  At issue then is whether Gaud-Figueroa is

entitled to the payment of Long-Term Disability benefits for September and October

2008, given that her benefits were properly terminated in April 2008 for lack of sufficient proof of Disability.[5]

The Plan provides that "[t]he Monthly Benefit will be paid to you . . . provided you remain Disabled and proof of continued Disability is submitted, at your expense, to us upon request."  AR 0029.  The Plan also provides that "[t]he Monthly Benefit will stop on the earliest of: a. the date that you cease to be Disabled; b. the date of your death; c. completion of the Maximum Benefit Duration shown in the SCHEDULE OF BENEFITS." Id.  Here, MetLife permissibly determined that Gaud-Figueroa ceased to be Disabled on April 8, 2008, and MetLife was entitled to terminate payment of Gaud-Figueroa's Monthly Benefit.

MetLife argues that Ms. Gaud-Figueroa was no longer covered by the LTD policy in September 2008, the month in which she was hospitalized for major depression and auditory hallucinations.  AR 0447, 0451-52.  MetLife contends that Gaud-Figueroa's eligibility for benefits terminated on April 8, 2008, when MetLife determined that Gaud-Figueroa had failed to provide adequate proof of continuing Disability.  See Def.'s Letter to the Ct., Doc. No. 30.  MetLife correctly observes that "once benefits are terminated, an employee must be deemed "Actively at Work" under the Plan for her Long Term Disability benefits to become effective again."  Id. at 2 (citing AR 0022).  MetLife then erroneously asserts that an employee can only be Actively at Work when she is

---

[5] For the months after October 2008, MetLife is entitled to rely on Dr. Sugerman's opinion that the Administrative Record is "lacking in sufficient detail of specific ongoing symptoms, mental status findings, and associated global impairment" to certify an ongoing Disability under the Plan.  AR 0452.

"performing all the material duties of [her] job with the Employer where these duties are normally carried out." Id. (citing AR 0020). However, the Plan specifically provides that:

> If you are not Actively at Work as an Employee because of a situation set forth below, the Employer may deem you to be in Active Work as an Employee only for the purpose of continuing your employment and only for the periods specified below in order that certain of your benefits under This Plan may be continued.

AR 0036. The "situation[s] set forth below" include "Your Sickness or Injury." Id. Under the Plan, a "Sickness" is an "illness, disease or pregnancy." AR 0024. The parties do not dispute that Gaud-Figueroa suffered from a Sickness during the relevant time period. The parties only dispute whether Gaud-Figueroa provided adequate proof to MetLife of a Sickness that rendered her completely Disabled.

The record reveals that both MetLife and Home Depot continued to treat Gaud-Figueroa as a covered employee after the termination of her LTD benefits on April 9, 2008. On July 28, 2008, a MetLife LTD Claim Specialist contacted the store manager at Home Depot, "where Gaud-Figueroa was employed," to discuss the possibility of accommodating Gaud-Figueroa's limiting conditions. Def.'s 56.1, ¶¶ 109-11, AR 0871-72. The store manager agreed to convert Gaud-Figueroa's "light" duty position into a part-time job, with appropriate restrictions on lifting. Id. at ¶ 111. Based on this record, the court infers that Home Depot and MetLife considered Gaud-Figueroa to be "Actively at Work" in July 2008.

As stated above, an Employer may only deem an Employee to be Actively at Work for certain time periods. AR 0036. The dates after which an employee may no longer be deemed Actively at Work are: "1. the date the Employer notifies us that your benefits are not to be continued; or 2. the end of the last period for which the Employer

has paid premiums to us for your benefits."  Id.  The Administrative Record does not

contain any evidence that Home Depot notified MetLife that Gaud-Figueroa's benefits

were to be discontinued or that Home Depot ceased paying premiums for Gaud-

Figueroa.[6]

Given that Gaud-Figueroa suffered from a Sickness, that Home Depot continued

to treat Gaud-Figueroa as an employee through at least July 2008, and that the

Administrative Record contains no mention of Home Depot terminating Gaud-Figueroa's

"Actively at Work" status, the court concludes that Gaud-Figueroa was still covered by

the Plan when she became Disabled in September 2008.

Given the medical evidence in the Administrative Record, and the conclusions of

MetLife's independent psychiatric consultant, Dr. Sugerman, Gaud-Figueroa was clearly

Disabled in September and October 2008.  At issue then is whether this subsequent

Disability should be characterized as a Recurrent Disability.  A "Recurrent Disability" is

defined as "a Disability which is related or due to the same cause or causes as a prior

Disability for which a Monthly Benefit was paid under This Plan."  AR 0028.  Here,

Gaud-Figueroa's hospitalization for depression and PTSD is due to the same cause as

a prior Disability for which a Monthly Benefit was previously paid to her under the Plan,

and therefore qualifies as a Recurrent Disability.

The Plan provides that, if a participant returns to work, but does so for less than

six consecutive months, the "Recurrent Disability will be a part of the same period of

---

[6] The Administrative Record contains all of MetLife's internal database entries on Ms. Gaud-Figueroa from August 24, 2007 through June 19, 2009.  AR 0758-0928.

Disability," and the participant does not need to complete a new Elimination Period (i.e., the six-month waiting period) before benefits become payable. AR 0031. By contrast, if the participant returns to work for more than six consecutive months, then "any Recurrent Disability will be treated as a new period of Disability" and the participant "must complete a new Elimination Period before Monthly Benefits are payable." Id.[7] The Plan is silent on whether an Elimination Period is required if a Plan participant has not returned to work in the period between two instances of Disability.

A contract provision is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement." O'Neil v. Ret. Plan for Salaries Employees of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir. 1994). In the context of the entire agreement, the Plan's silence on this issue could be interpreted in two reasonable ways. On the one hand, a return to work could be viewed as an absolute predicate condition to receiving the waiver of the Elimination Period. On the other hand, MetLife could reasonably conclude that a participant who suffers a Disability which recurs within six months of a prior period of Disability should be treated as meeting the contractual provision that waives the Elimination Period for participants who suffer a Recurrent Disability after returning to work for less than six months.

The latter conclusion is particularly appropriate where a return to work would have been impossible or unduly prejudicial to the Plan participant. In this case, Gaud-Figueroa's benefits were initially terminated for a failure to provide adequate proof of her

---

[7] The SPD contains similar provisions. AR 0071.

Disability, and in the months following termination Gaud-Figueroa submitted additional documentation with the hope of having her benefits restored. If Gaud-Figueroa was indeed Disabled, but failed to provide adequate proof, then she physically would have been unable to return to work in the months between April and September 2008. Although Gaud-Figueroa did not resume her duties at Home Depot, the time frame between the April 2008 termination and the September 2008 hospitalization was less than six months, and a reasonable interpretation of the Plan might permit the immediate reinstatement of benefits without a second Elimination Period.

Where an ERISA plan is reviewed <u>de novo</u> by the court, "ambiguities . . . are construed in favor of the plan beneficiary." <u>Fay v. Oxford Health Plan</u>, 287 F.3d 96, 104 (2d Cir. 2002); <u>see</u> <u>also</u> <u>Krauss v. Oxford Health Plans, Inc.</u>, 517 F.3d 614, 622 (2d Cir. 2008). However, if an ERISA plan vests the Plan administrator with discretionary authority to determine eligibility, the Plan administrator has the authority to interpret ambiguous provisions of the Plan. <u>See</u> <u>Parry v. SBC Communications, Inc.</u>, 375 F.Supp.2d 31, 48, n.8 (D. Conn. 2005) (doctrine requiring construction of ambiguity against the insurer "applies only where a court is undertaking a de novo review, it does not require such a result in a case reviewed under the arbitrary and capricious standard."). Because MetLife wrongly determined that Gaud-Figueroa was not covered by the Plan in September 2008, MetLife never addressed whether Gaud-Figueroa would be required to complete a new Elimination Period under the Recurrent Disability provisions of the Plan. Therefore, the court remands the benefit determination for September and October 2008 to MetLife for an opportunity to decide whether Gaud-

Figueroa was required to complete a second Elimination Period for this Recurrent Disability.

2.	Whether MetLife Abused Its Discretion in Weighing the Opinions of Gaud-Figueroa's Treating Physicians

While MetLife cannot ignore the opinions of Gaud-Figueroa's treating physicians, it is not required to accord any special weight to their conclusions, and it is permitted to credit other reliable evidence.  As the Supreme Court articulated in <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003):

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

<u>Id.</u> at 834.

Subjective complaints of pain reported to a treating physician must be weighed by the administrator in reaching its disability determination.  The Second Circuit in <u>Hobson</u> reiterated the court's earlier admonition that "the subjective element of pain is an important factor to be considered in determining disability."  <u>Hobson</u>, 574 F.3d at 88 (quoting <u>Connors v. Conn. Gen. Life Ins. Co.</u>, 272 F.3d 127, 136 (2d Cir. 2001)).  Here MetLife acknowledged the reports from Gaud-Figueroa's treating physicians regarding her pain, but weighed this against the absence of objective medical findings that this pain rendered her totally disabled from all gainful employment as required by the Plan.  See <u>Tortora v. SBC Communications, Inc.</u>, __ F.Supp.2d __, 2010 WL 3154566, at *9 (S.D.N.Y. 2010) ("While an administrator may not arbitrarily disregard evidence

submitted by a claimant's physician, Sedgwick was not required to accept Tortora's subjective complaints in the absence of objective evidence supporting disability.")

In this case, MetLife had three independent physicians, none of whom was a MetLife employee and all of whom were Board-certified in one or more of the specialty areas relevant to Gaud-Figueroa's conditions, review Gaud-Figueroa's file. "MetLife did not abuse its discretion by considering these trained physicians' opinions solely because they were selected and presumably compensated by MetLife." Hobson, 574 F.3d at 90. Moreover, in this case, the physicians treating Gaud-Figueroa's back and foot conditions did not indicate that Gaud-Figueroa was Disabled as that term is defined in the Plan. Gaud-Figueroa's psychiatrist concluded that Gaud-Figueroa was completely disabled from any gainful occupation, including sedentary employment. However, MetLife was entitled to credit the opinion of Dr. Sugerman that there was "no supporting medical information that this [Gaud-Figueroa's PTSD and depression] was a continuous impairment from April 2008 to September 2008, therefore again not supporting that her condition was at a severity as of April 9, 2008 that would preclude her from performing any and all occupations as defined by the Plan." AR 0435. MetLife's decision to follow the opinion of Dr. Sugerman over the conclusions of Gaud-Figueroa's treating psychiatrist cannot be characterized as an abuse of discretion.

## V. CONCLUSION

For the reasons stated above, MetLife's termination of Gaud-Figueroa's Long-Term Disability benefits was within their discretion as Plan administrator. However, the court remands the benefit determination for September and October 2008 to MetLife for

consideration of whether Gaud-Figueroa was required to complete a second Elimination Period for her Recurrent Disability. The Defendant's Motion for Summary Judgment **(Doc. No. 18)** is **GRANTED IN PART** and **DENIED IN PART**. The Plaintiff's Motion for Judgment on the Administrative Record **(Doc. No. 19)** is **GRANTED IN PART** and **DENIED IN PART.**

The Clerk is hereby directed to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 14th day of February, 2011.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge